UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FEDERATED MUTUAL INSURANCE COMPANY, <br><br>          Plaintiff, <br><br>    v. <br><br> PETERSON'S OIL SERVICE, INC.; <br> HOWARD WOOD PETERSON, JR.; <br> KRISTEN PETERSON HALUS; and <br> SHEENA MARANDINO, SEAN MARANDINO, <br> NANCY CARRIGAN, CLAIRE FREDA, KELLEY <br> FREDA, ALICE HART, ROBERT F. HART, TORRE <br> MASTROIANNI, and CONGREGATION BETH <br> ISRAEL OF WORCESTER, individually and on behalf <br> of others similarly situated, <br><br>          Defendants. | **COMPLAINT FOR DECLARATORY JUDGMENT AND JURY DEMAND** <br><br> Civil Action No.: |

## STATEMENT OF THE CASE

1.       This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201, in which Federated Mutual Insurance Company ("Federated") requests the Court to declare the rights, duties, and obligations of the parties under several insurance policies issued by Federated to Defendant Peterson's Oil Service, Inc., bearing policy numbers 9816872, 6102876, 9816870, and 9816874, effective from July 5, 2019 to July 5, 2022 (collectively, the "Policies").

2.       Federated seeks a judgment declaring that it has no duty under the Policies to defend or indemnify Defendants Peterson's Oil Service, Inc., Howard Wood Peterson, Jr., and Kristen Peterson Halus (collectively, "Peterson's Oil") with respect to claims asserted against them in a putative class action filed by Defendants Sheena Marandino, Sean Marandino, Nancy

Carrigan, Claire Freda, Kelley Freda, Alice Hart, Robert F. Hart, Torre Mastroianni, and Congregation Beth Israel of Worcester (collectively, "Claimants") captioned *Marandino et al. v. Peterson Oil Service, Inc., et al.*, Civil Action No. 1985-CV-0792 B (Mass. Sup. Ct.) (the "Underlying Lawsuit").

## PARTIES

3.      Federated is an insurance company organized and existing under the laws of the State of Minnesota, with its principal place of business in the State of Minnesota.

4.      Defendant Peterson's Oil Service, Inc. is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business in the Commonwealth of Massachusetts.

5.      Defendant Howard Wood Peterson, Jr. is an individual residing in the Commonwealth of Massachusetts and is a citizen thereof, and is the President of Defendant Peterson's Oil Service, Inc.

6.      Defendant Kristen Peterson Halus is an individual residing in the Commonwealth of Massachusetts and is a citizen thereof, and is the Vice President of Defendant Peterson's Oil Service, Inc.

7.      Defendant Sheena Marandino is an individual residing in the Commonwealth of Massachusetts and is a citizen thereof.

8.      Defendant Sean Marandino is an individual residing in the Commonwealth of Massachusetts and is a citizen thereof.

9.      Defendant Nancy Carrigan is an individual residing in the Commonwealth of Massachusetts and is a citizen thereof.

10.     Defendant Claire Freda is an individual residing in the Commonwealth of Massachusetts and is a citizen thereof.

2

11.     Defendant Kelley Freda is an individual residing in the Commonwealth of Massachusetts and is a citizen thereof.

12.     Defendant Alice Hart is an individual residing in the Commonwealth of Massachusetts and is a citizen thereof.

13.     Defendant Robert F. Hart is an individual residing in the Commonwealth of Massachusetts and is a citizen thereof.

14.     Defendant Torre Mastroianni is an individual residing in the Commonwealth of Massachusetts and is a citizen thereof.

15.     Defendant Congregation Beth Israel of Worcester is a religious entity formed under Chapter 180 of the General Laws of Massachusetts and is headquartered in the Commonwealth of Massachusetts.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00 exclusive of costs and interest, and there is complete diversity of citizenship between the Plaintiff and Defendants. Specifically, Claimants have demanded compensation from Peterson's Oil in an amount exceeding $75,000.00, and Peterson's Oil has claimed an entitlement to defense and indemnity under the Policies with respect to said claims.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, as Defendants reside in this District and the events giving rise to this insurance dispute occurred within this District.

## FACTUAL BACKGROUND

### A.     The Underlying Lawsuit

18.     In their operative Second Amended Complaint, which is attached hereto as Exhibit A, Claimants allege that beginning in 2012 and continuing to the present day, Peterson's Oil has

3

misrepresented the levels of biodiesel contained in heating oil delivered to its customers. It is alleged that elevated levels of biodiesel in said fuel caused damage to customers' heating equipment, and various consequential and economic damages.

19.    Specifically, Claimants allege that Peterson's Oil represented to Claimants and putative class members that it was selling "#2 heating oil." It is alleged that #2 heating oil is a class of fuel for home heating appliances which meets "standard D396 of ATSM International." Claimants allege that heating oil meets this standard and may be classified as #2 heating oil only if it contains 5% or less biodiesel.

20.    It is alleged that, contrary to these standards, Peterson's Oil has been mixing biodiesel into its "#2 heating oil" in proportions greater than 5%, without disclosing to its customers that the oil contained *any* biodiesel.

21.    In particular, Claimants allege that from 2015 to 2018, Peterson's Oil delivered heating oil with no less than 12% biodiesel.  Indeed, Claimants allege that during this timeframe, Peterson's Oil delivered heating oil with an average of 35% biodiesel, and in some shipments, 70% or more biodiesel.  In short, Claimants allege that "none of the fuel Peterson Oil delivered the Plaintiffs between at least 2012 and the present was fuel that met industry standards for heating oil." (Ex. A ¶ 130.)

22.    Claimants allege that fuel with such high percentages of biodiesel is generally incompatible with home heating equipment. Specifically, it is alleged that prior to 2021 no burner manufacturer had approved use of their equipment with fuel containing greater than 5% biodiesel without a conversion kit.  Such conversion kits allegedly permit heating equipment to process fuel with up to 20% biodiesel, but no more.  Fuels with high biodiesel content allegedly gel in cold

climates such as Massachusetts', corrode and clog heating equipment and storage tanks, output less energy than ordinary heating oil, and pose an increased risk of spontaneous combustion.

23.     Claimants allege that Peterson's Oil knew that its #2 heating oil contained biodiesel in greater proportions than permitted by the ATSM standard, and that it understood the risks posed by blended fuel. (*See* Ex. A ¶¶ 128, 132-35, 140, 158-60.)

24.     According to Claimants, Peterson's Oil did not disclose the presence of biodiesel in its #2 heating oil—and the attendant alleged risks—to any of the Claimants prior to March 2019.

25.     In March 2019, Peterson's Oil allegedly included a notice in the invoices it sent to its customers, which informed them that they were receiving heating oil containing biodiesel.  The notice allegedly stated that the biodiesel content in Peterson's #2 heating oil had "increased each year from 2012," and that Peterson's "most popular product" included biodiesel blends of "up to 80%."

26.     The March 2019 notice followed a February 19, 2019 investigative report, broadcast by the WBZ TV, CBS Channel 4 "I Team," which presented an interview between Defendant Howard Wood Peterson, Jr. and I Team investigators.  It is alleged that in the I Team interview, investigators presented evidence that certain Claimants had received fuel containing more than 80% biodiesel.

27.     Howard Wood Peterson, Jr. allegedly indicated to the interviewers that he believed heating fuel should contain 80% biodiesel, "not 20 [percent]," and suggested that Peterson's Oil would lead the industry to this goal.

28.     Claimants also allege that the March 2019 notice was prompted by a decision of the Massachusetts Department of Energy Resources ("DOER"), in which DOER allegedly suspended Peterson's ability to obtain tax credits.

29.     DOER's decision followed an audit, which allegedly revealed that contrary to Peterson's Oil's representations to DOER, Peterson's Oil had not been disclosing the biodiesel content of its heating oil to consumers.

30.     According to Claimants, the March 2019 notice served to cure the deficiency allegedly found by DOER.  Claimants allege that, even after the March 2019 notice, Peterson's Oil did not disclose the known risks of using heating oil containing high proportions of biodiesel.

31.     Claimants allege that the undisclosed presence of biodiesel in their fuel caused damages to each of the Claimants.

32.     Sheena and Sean Marandino allege that they received two deliveries of fuel in the 2018–2019 heating season, which caused their furnace to shut down twice. The Marandinos allegedly incurred expenses for several visits by repair technician and were ultimately forced to purchase replacement fuel at a higher price per gallon.

33.     Nancy Carrigan alleges that the fuel caused her furnace to shut down four times between September and October 2018, and ultimately required her to replace her oil tank at a cost of $3,000.

34.     Claire and Kelley Freda allegedly lost heat and hot water in March 2020, May 2020, and August 2020, resulting in damage to their furnace and expenses for repair technicians.

35.     Alice and Robert F. Hart allege that the fuel caused their furnace to shut down sometime between November 2018 and January 2019, while the Harts spent the winter in Arizona. It is alleged that several pipes burst as a consequence, causing nearly $15,000 in water damage. The Harts were allegedly also required to replace their oil tank, at a cost of $3,150.

36.     Torre Mastroianni allegedly lost heat in March 2021, and was required to pump fuel supplied by Peterson's Oil from his tank, incurring expenses for multiple service calls.

37.     Finally, Congregation Beth Israel allegedly lost heat over twenty times in the 2018–2019 heating season, requiring numerous repairs and necessitating cleaning its oil tank, at a cost of approximately $18,000.

38.     In addition to their individual claims, Claimants assert claims on behalf of two putative sub-classes.  First, Claimants assert claims on behalf of a class of "customers who received fuel from Defendant that was described as '#2 fuel oil,' '#2 heating fuel,' and/or 'heating oil,' but in actuality was fuel containing more than five percent (5%) biodiesel, at any point between the date on which Defendant began delivering fuel with more than 5% biodiesel and March 2019."

39.     Second, Claimants assert claims on behalf of a class of "customers who purchased fuel from March 2019 until the present date."

40.     The March 2019 sub-class demarcation date corresponds to the March 2019 notice Peterson's Oil sent to customers, which allegedly constituted the first such notice informing customers that their fuel contained biodiesel—but which nevertheless allegedly failed to disclose the known risks of using heating oil containing high proportions of biodiesel.

41.     Claimants' Second Amended Complaint names Peterson's Oil Service, Inc. and its officers, Howard Wood Peterson, Jr. and Kristen Peterson Halus, as defendants. It asserts five counts: (1) breach of contract against Peterson's Oil; (2) fraud against all defendants; (3) negligence against all defendants; (4) unfair and deceptive trade practices claims against Peterson's Oil; and (5) negligence and fraud claims against Howard Wood Peterson, Jr. and Kristen Peterson Halus in their individual capacities.

42.     Prior to filing their original complaint, Claimants served a class-action demand letter on March 18, 2019, pursuant to Massachusetts General Laws Chapter 93A.

43.     The Chapter 93A demand letter "demand[ed] . . . that Peterson Oil compensate the Marandinos and Class members who were harmed by Peterson Oil's delivery of fuel containing over five percent (5%) biodiesel when the Marandinos and Class members had agreed to purchase industry-standard (#2) heating oil." (Ex. A ¶ 185.)

44.     By letter dated November 24, 2021, Federated denied coverage for Peterson's Oil with respect to the Underlying Lawsuit.

45.     By letter dated March 9, 2022, Claimants demanded, pursuant to Massachusetts General Laws Chapters 93A and 176D, that Federated tender $19,860,664.50 toward settlement of their claims against Peterson's Oil.

**B.     The Policies**

46.     Federated issued several insurance policies to Defendant Peterson's Oil Service, Inc. for annual policy periods beginning on July 5, 2019 and continuing to the present.

47.      First, Federated issued a Commercial Package Policy, policy number 9816872, with annual aggregate liability limits of $2 million and per-occurrence limits of $1 million (the "CPP Policy"). The CPP Policy contains four Coverage Parts: a (1) Commercial Property Coverage Part; (2) Commercial Inland Marine Coverage Part; (3) Commercial General Liability ("CGL") Coverage Part (which coverage is subject to a $2,500 deductible); and (4) Commercial Crime Coverage Part.  A certified copy of the 2019–2020 CPP Policy, whose pertinent provisions are substantially the same as those issued in subsequent years, is attached as Exhibit B.

48.     Second, Federated issued a Business Auto Policy, policy number 6102876, with an annual per-accident liability limit of $1 million, subject to a $2,500 deductible (the "BAP Policy").

49.     Third, Federated issued a Commercial Package Policy, policy number 9816870, limited to Business Auto Coverage for certain autos garaged in Rhode Island, with annual per-accident liability limits of $1 million, subject to a $2,500 deductible (the "Rhode Island Policy").

8

50.     Finally, Federated issued a Commercial Umbrella Liability Policy, policy number 9816874, with annual per-occurrence and aggregate liability limits of $10 million (the "Umbrella Policy").  The Umbrella Policy provides excess coverage over the CPP Policy's CGL Coverage Part and the BAP Policy.  A certified copy of the 2019–2020 Umbrella Policy, whose pertinent provisions are substantially the same as those issued in subsequent years, is attached as Exhibit C.

51.     Howard Wood Peterson, Jr. is an insured under the Policies in his capacity as an executive officer of Peterson's Oil Service, Inc.

52.     Kristen Peterson Halus is an insured under the Policies in her capacity as an executive officer of Peterson's Oil Service, Inc.

## COVERAGE UNDER THE POLICIES

**A.     Coverage Under the CPP Policy**

53.     As stated previously, the CPP Policy contains four Coverage Parts: a (1) Commercial Property Coverage Part; (2) Commercial Inland Marine Coverage Part; (3) Commercial General Liability ("CGL") Coverage Part; and (4) Commercial Crime Coverage Part.

54.     The Commercial Property Coverage Part does not cover the Underlying Lawsuit. Under the Commercial Property Coverage Part's Legal Liability Coverage Form (form CP 00 40 10 12), Federated agreed to "pay those sums that you become legally obligated to pay as damages because of direct physical loss or damage . . . to Covered Property" (defined to mean "tangible property of others in your care, custody or control" which is identified in the Policy's declarations or schedules), which is "caused by an accident and arising out of any Covered Cause of Loss." Claimants' property is not "Covered Property," the property damage alleged by Claimants was not caused by a "Covered Cause of Loss," and the Underlying Lawsuit, therefore, does not trigger the Commercial Property Coverage Part.

55.     The Commercial Inland Marine Coverage Part does not cover the Underlying Lawsuit. The Commercial Inland Marine Coverage Part offers first-party coverage for loss to certain property, such as business computers, and does not afford third-party liability coverage.

56.     Similarly, the Commercial Crime Coverage Part offers first-party coverage for loss caused by various crimes, and its insuring agreement is not triggered by the Underlying Lawsuit.

57.     The CPP Policy's CGL Coverage Part includes three coverages: Coverage A – Bodily Injury and Property Damage Liability; Coverage B – Personal and Advertising Injury Liability; and Coverage C – Medical Payments.

58.     The Coverage A insuring agreement provides:

**SECTION I – COVERAGES**

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement**

  **a.**  We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for . . . "property damage" to which this insurance does not apply. . . .

                                        ***

  **b.**  This insurance applies to . . . "property damage" only if:

  **(1)** The . . . "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

  **(2)** The . . . "property damage" occurs during the policy period; and

  **(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured . . . knew

10

that the . . . "property damage" had occurred, in whole or in part. If such a listed insured . . . knew, prior to the policy period, that the . . . "property damage" occurred, then any continuation, change or resumption of such . . . "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

\*\*\*

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured . . . :

\*\*\*

**(2)** Receives a written or verbal demand or claim for damages because of the . . . "property damage"; or

**(3)** Becomes aware by any other means that . . . "property damage" has occurred or has begun to occur.

59.   Under paragraph b(3), the Coverage A insuring agreement precludes coverage for property damage if, prior to the policy period, an insured "knew that the . . . 'property damage' had occurred, in whole or in part."  Any continuation of such property damage is deemed to have been known prior to the policy period.

60.   Under paragraph d, an insured is deemed to know that property damage has occurred at the earliest time that any insured "[r]eceives a written or verbal demand or claim for damages because of the . . . 'property damage,'" or "[b]ecomes aware by any other means that . . . 'property damage' has occurred or has begun to occur."

61.   The Underlying Lawsuit alleges that on March 18, 2019, Claimants served a Chapter 93A demand letter on Peterson's Oil "demanding . . . that Peterson Oil compensate the Marandinos and Class members who were harmed by Peterson Oil's delivery of fuel containing

over five percent (5%) biodiesel when the Marandinos and Class members had agreed to purchase industry-standard (#2) heating oil." (Ex. A ¶ 185.)

62.     Pursuant to paragraph d(2), the Chapter 93A letter constitutes a "written or verbal demand or claim for damages because of the . . . 'property damage'" alleged by Claimants and their class members.

63.     Accordingly, Peterson's Oil is deemed to have known that the property damage alleged in the Underlying Lawsuit had occurred as of March 18, 2019.  March 18, 2019 is prior to the first policy period—which began July 5, 2019—in which Federated insured Peterson's Oil. Thus, coverage for the Underlying Lawsuit is barred by paragraph b(3) of the Coverage A insuring agreement.

64.     Additionally, Claimants allege that Defendants Howard Wood Peterson, Jr. and Kristen Peterson Halus knew, prior to March 18, 2019, that the blended heating oil was causing property damage to customers' heating equipment.

65.     Specifically, Claimants allege that the WBZ I Team's February 2019 report included an interview with a Peterson's Oil technician who discussed extensive repairs required by the blended heating fuel; and that Peterson's Oil was necessarily aware, through allegedly numerous calls to its service department, that the blended heating fuel had damaged customers' heating equipment. (*See* Ex. A ¶ 159.)

66.     To the extent Peterson's Oil and its officers became aware that damage to Claimants' and class members' heating equipment "ha[d] occurred or ha[d] begun to occur" prior to the policy period, coverage for the Underlying Lawsuit is precluded by paragraphs b(3) and d(3) of the Coverage A insuring agreement.

67.     Furthermore, pursuant to paragraph b(2) of the insuring agreement, property damage claims trigger Coverage A only if such property damage "occurs during the policy period." The CPP Policy's Continuous or Progressive Injury or Damage endorsement (form CG-F-68 (10-01)) further provides:

> This policy does not apply to, and the Company shall have no duty to defend, any claim seeking . . . "property damage" that occurred before the policy period, regardless of whether that . . . "property damage" is also deemed to have occurred during the policy period of this policy.

68.     With respect to Claimants' individual claims, Claire Freda, Kelley Freda, and Torre Mastroianni are the only named plaintiffs in the Underlying Lawsuit who allege property damage occurring after the CCP Policy's first policy period commenced on July 5, 2019. Sheena Marandino, Sean Marandino, Nancy Carrigan, Alice Hart, Robert F. Hart, and Congregation Beth Israel of Worcester exclusively allege property damage occurring prior to the policy period, and coverage for their claims is plainly barred.

69.     With respect to Claimants' class allegations, the first putative sub-class is composed of "customers who received fuel from Defendant that was described as '#2 fuel oil,' '#2 heating fuel,' and/or 'heating oil,' but in actuality was fuel containing more than five percent (5%) biodiesel, at any point between the date on which Defendant began delivering fuel with more than 5% biodiesel and March 2019."

70.     Blended heating oil with high biodiesel content immediately begins causing damage to incompatible heating equipment.  This is because biodiesel is corrosive to fuel tanks and yellow metals, such as copper fuel lines and the brass fittings often used in oil burners. Biodiesel further causes the release of particles which become suspended in the heating fuel,

13

clogging heating equipment. And burning biodiesel causes soot buildup, which damages CAD cells and causes excess wear and tear to the equipment.

71.     Claimants' alleged property damage therefore occurred or began to occur at the moment their heating equipment began burning heating oil containing high levels of biodiesel.

72.     Consequently, the first putative sub-class, by its definition, is composed of claimants whose alleged property damage occurred or began to occur prior to the policy period. Even if such property damage also "occurred" during the policy period, coverage therefor is barred under the Continuous or Progressive Injury or Damage endorsement.

73.     The second putative sub-class is composed of "customers who purchased fuel from March 2019 until the present date."  Any property damage alleged by such class members which occurred or began to occur prior to July 5, 2019 is likewise barred from coverage.

74.     Moreover, under the Multi-Cover Liability Endorsement (form CG-F-6 (04-19)), any property damage "expected or intended from the standpoint of the insured" is excluded from coverage.

75.     To the extent the Underlying Lawsuit includes claims for which intentional conduct is a requisite element, such claims are necessarily excluded from coverage.

76.     Upon information and belief, by the time Federated issued its policies, Peterson's Oil Service, Inc. and its officers "knew with substantial certainty, that some injury would result" from its alleged blending of biodiesel into heating oil sold to its customers.  *Hanover Ins. Co. v. Talhouni*, 413 Mass. 781, 785, 604 N.E.2d 689, 691 (1992). Consequently, Claimants' alleged property damage was "expected or intended from the standpoint of the insured," and is excluded from coverage.

77.    The CPP Policy's Coverage B does not apply to the Underlying Lawsuit, either. Its

insuring agreement provides, in pertinent part:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. . . .

78.    "Personal and advertising injury" means:

> [I]njury, including consequential 'bodily injury', arising out of one or more of the following offenses:
>
> **a**. False arrest, detention or imprisonment;
>
> **b**. Malicious prosecution;
>
> **c**. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;
>
> **d**. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
>
> **e**. Oral or written publication, in any manner, of material that violates a person's right of privacy;
>
> **f**. The use of another's advertising idea in your "advertisement"; or
>
> **g**. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

79.    The Underlying Lawsuit does not allege that Claimants or putative class members

sustained "personal and advertising injury" to which Coverage B applies. Thus, Coverage B does

not cover the Underlying Lawsuit.

80.    Nor does the CPP Policy's Coverage C apply.  Coverage C provides coverage for

"medical expenses . . . for 'bodily injury' caused by an accident" under certain enumerated

conditions.  Claimants do not allege that they sustained bodily injuries caused by an accident within the scope of Coverage C.

81.     Finally, each CPP Policy issued by Federated is subject to a $1 million per-occurrence liability limit.  Pursuant to the CPP Policy's Limits of Insurance provisions, "the Each Occurrence Limit is the most we will pay for the sum of . . . [d]amages under Coverage A . . . because of all . . . 'property damage' arising out of any one 'occurrence.'"

82.     Moreover, the Two or More Coverage Forms or Policies Issued by Us endorsement (form CG-F-111 (03-12)) provides:

> If this coverage form and any other coverage form or policy issued to you by us or any company affiliated with us applies to the same "occurrence", the maximum Each Occurrence Limit under all the coverage forms or policies shall not exceed the highest applicable Each Occurrence Limit under any one coverage form or policy. This condition does not apply to any coverage form or policy issued by us or an affiliated company specifically to apply as excess insurance over this coverage form.

83.     "Occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

84.     Claimants' and class members' alleged property damage shares the same cause: Peterson's Oil's alleged blending of biodiesel into heating oil it sold to its customers.  As alleged in their Second Amended Complaint, Claimants' property damage is caused by "continuous or repeated exposure to substantially the same general harmful conditions."  Accordingly, all property damage alleged in the Underlying Lawsuit arises from the same "occurrence."

85.     As a result, under the CPP Policy's Limits of Insurance provisions and Two or More Coverage Forms or Policies Issued by Us endorsement, Federated's maximum aggregate coverage obligation with respect to the Underlying Lawsuit, under all its CPP Policies, is the $1 million per-occurrence policy limit.

**B.  Coverage Under the BAP Policy**

86.    The BAP Policy's insuring agreement provides, in pertinent part:

> We will pay all sums an "insured" legally must pay as damages because of . . . "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto."

87.    Claimants do not allege property damage caused by an "accident" *resulting from the ownership, maintenance or use of any "auto"* covered by the BAP Policy.  Accordingly, the BAP Policy is not triggered by the Underlying Lawsuit.

88.    Additionally, the BAP Policy contains several exclusions which would limit or preclude coverage, were the BAP Policy triggered. Such provisions include an "Expected or Intended Injury" exclusion, a "Completed Operations" exclusion, and a "Wrong Delivery of Liquid Products" exclusion.

**C.    Coverage Under the Rhode Island Policy**

89.    The Rhode Island Policy, like the BAP Policy, is an auto liability policy entirely inapplicable to the Underlying Lawsuit.  Its insuring agreement provides, in pertinent part:

> We will pay all sums an "insured" legally must pay as damages because of . . . "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

90.    The Policy's covered "autos" are identified as five vehicles garaged at an address in Rhode Island. Claimants do not allege any property damage caused by an accident resulting from the ownership, maintenance, or use of the covered Rhode Island autos.  Accordingly, the Rhode Island Policy is not triggered by the Underlying Lawsuit.

91.    Moreover, the Rhode Island Policy contains several exclusions which would limit or preclude coverage, were the Rhode Island Policy triggered. Such provisions include an

"Expected or Intended Injury" exclusion, a "Completed Operations" exclusion, and a "Wrong Delivery of Liquid Products" exclusion.

**D.    Coverage Under the Umbrella Policy**

92.    Lastly, Federated issued an Umbrella Policy whose insuring agreement provides, in pertinent part:

> We will pay on behalf of the insured those sums the insured becomes legally obligated to pay as damages that are in excess of the applicable limits of "underlying insurance" because of . . . "property damage" . . . :
>
> **1.**   that occurs during the policy period shown on the Commercial Umbrella Liability Declarations; and
>
> **2.**   that is covered by "underlying insurance".

93.    The Umbrella Policy defines "underlying insurance" to include the CPP Policy.

94.    The Umbrella Policy thus applies only to claims for property damage that occurs during the policy period and is covered by the CPP Policy.

95.    Further, the Umbrella Policy is subject to "all exclusions contained within" the CPP Policy.

96.    As alleged above in connection with the CPP Policy, the Underlying Lawsuit alleges property damage which did not "occur[] during the policy period," and coverage for such claims is precluded by paragraph 1 of the Umbrella Policy's insuring agreement.

97.    As alleged above in connection with the CPP Policy, the Underlying Lawsuit is not covered by the CPP Policy; as a result, the Underlying Lawsuit is not "covered by 'underlying insurance'" as required by paragraph 2 of the Umbrella Policy's insuring agreement.

98.    And as alleged above in connection with the CPP Policy, coverage for the Underlying Lawsuit is excluded by the CPP Policy's Multi-Cover Liability Endorsement (form

CG-F-6 (04-19)), which excludes any property damage "expected or intended from the standpoint of the insured"; such exclusion is equally applicable under the Umbrella Policy.

99.    The Umbrella Policy's Limits of Insurance section, as amended by the Aggregate Limit Changes endorsement (form CU-F-116 (10-08)), provides in pertinent part:

> A.  The Occurrence Limit stated in the Declarations is the most we will pay for each "accident", "allegation", or "occurrence" regardless of the number of:
>
>     1.  insureds;
>
>     2.  claims made or suits brought;
>
>     3.  persons or organizations making claims or bringing suit; or
>
>     4.  "underlying insurance" policies or types of applicable underlying coverage.

100.   The Umbrella Policy includes the following condition:

> **O. Two Or More Umbrella Policies Issued By Us**
>
> If this policy and any other umbrella policy issued by us or any company affiliated with us:
>
>     1.  applies to the same "accident", "allegation" or "occurrence"; and
>
>     2.  affords coverage from two or more umbrella policies to any insured or combination of insureds,
>
> the aggregate maximum Limit of Insurance under all umbrella policies shall not exceed the highest applicable Limit of Insurance under any one umbrella policy.

101.   "Occurrence" means "an 'accident', including continuous or repeated exposure to substantially the same general harmful conditions."

102.   Claimants' and class members' alleged property damage shares the same cause: Peterson's Oil's alleged blending of biodiesel into heating oil it sold to its customers.  As alleged in their Second Amended Complaint, Claimants' property damage is caused by "continuous or

19

repeated exposure to substantially the same general harmful conditions."  Accordingly, all property

damage alleged in the Underlying Lawsuit arises from the same "occurrence."

103.    As a result, under the Limits of Insurance provisions and the Two or More Umbrella

Policies Issued by Us condition, Federated's maximum aggregate coverage obligation with respect

to the Underlying Lawsuit, under all its Umbrella Policies, is the $10 million per-occurrence policy

limit.

104.    Upon information and belief, Defendants dispute Federated's coverage position

with respect to each of the policies discussed above.

105.    Therefore, there are ripe and justiciable controversies between the parties requiring

declaratory relief by this Court.

## RESERVATION OF RIGHTS

106.    The insurance policies issued by Federated contain other terms, conditions,

limitations, and exclusions which may limit or preclude coverage.  Federated reserves the right to

assert such provisions and raise additional coverage defenses should discovery warrant it.

## COUNT I

## DECLARATORY JUDGMENT
## THAT FEDERATED OWES NEITHER
## DEFENSE NOR INDEMNITY UNDER THE CPP POLICY

107.    Federated incorporates and restates the allegations of Paragraphs 1 through 106

above as if fully set forth herein.

108.    Pursuant to the plain and unambiguous language of the CPP Policy, the Underlying

Lawsuit does not trigger the CPP Policy's Commercial Property Coverage Part.

109.    Pursuant to the plain and unambiguous language of the CPP Policy, the Underlying

Lawsuit does not trigger the CPP Policy's Commercial Inland Marine Coverage Part.

110.    Pursuant to the plain and unambiguous language of the CPP Policy, the Underlying Lawsuit does not trigger the CPP Policy's Commercial Crime Coverage Part.

111.    Under the CPP Policy's CGL Coverage A, coverage is precluded for property damage if, prior to the policy period, an insured "knew that the . . . 'property damage' had occurred, in whole or in part."  Any continuation of such property damage is deemed to have been known prior to the policy period.

112.    Prior to the policy period's commencement on July 5, 2019, Peterson's Oil received a written demand or claim for damages caused to its customers as a result of the biodiesel content of heating oil sold to its customers, in the form of a Chapter 93A demand letter served by Claimants on March 18, 2019.

113.    As a result, Peterson's Oil is deemed to have known about Claimants' and class members' alleged property damage prior to the policy period pursuant to paragraph d(2) of the Coverage A insuring agreement. Coverage for the Underlying Lawsuit is, therefore, precluded under paragraph b(3) of the insuring agreement.

114.    Prior to the policy period's commencement on July 5, 2019, Peterson's Oil became aware—through calls to its service department, the WBZ I Team's investigation, and/or other sources—that property damage had occurred or had begun to occur to customers' property as a result of the biodiesel content of heating oil sold to its customers.

115.    As a result, Peterson's Oil is deemed to have known about Claimants' and class members' alleged property damage prior to the policy period pursuant to paragraph d(3) of the Coverage A insuring agreement. Coverage for the Underlying Lawsuit is, therefore, precluded under paragraph b(3) of the insuring agreement.

116.   Further, under the CPP Policy's CGL Coverage A, coverage is triggered by property damage claims only if such property damage "occurs during the policy period." Pursuant to the Continuous or Progressive Injury or Damage endorsement (form CG-F-68 (10-01)), property damage that occurs both before and during the policy period is nevertheless barred from coverage.

117.   With respect to Claimants' individual claims, Defendants Sheena Marandino, Sean Marandino, Nancy Carrigan, Alice Hart, Robert F. Hart, and Congregation Beth Israel of Worcester exclusively allege property damage occurring prior to the policy period.  Pursuant to the plain and unambiguous language of the Coverage A insuring agreement, coverage for their claims is barred.

118.   With respect to Claimants' class allegations, the first putative sub-class is composed of customers who received blended fuel from Peterson's Oil prior to March 2019.  Blended heating oil with high biodiesel content immediately begins causing damage to incompatible heating equipment.  Consequently, property damage alleged by members of the first putative sub-class necessarily occurred prior to the policy period, and coverage therefor is barred by the plain and unambiguous language of the Coverage A insuring agreement.

119.   Even if property damage sustained by members of the first putative sub-class also occurred during the policy period, coverage therefor would be barred by the plain and unambiguous language of the Continuous or Progressive Injury or Damage endorsement.

120.   With respect to Claimants' second putative sub-class, composed of customers who purchased fuel from Peterson's Oil from March 2019 to the present, any property damage alleged by such class members which occurred or began to occur prior to July 5, 2019 is likewise barred from coverage by the plain and unambiguous language of the Coverage A insuring agreement and the Continuous or Progressive Injury or Damage endorsement.

121.    Further, under the Multi-Cover Liability Endorsement (form CG-F-6 (04-19)), any property damage "expected or intended from the standpoint of the insured" is excluded from coverage.

122.    To the extent the Underlying Lawsuit includes claims for which intentional conduct is a requisite element, such claims are necessarily excluded from coverage.

123.    Upon information and belief, by the time Federated issued its policies, Peterson's Oil Service, Inc. and its officers "knew with substantial certainty, that some injury would result" from its alleged blending of biodiesel into heating oil sold to its customers.  *Hanover Ins. Co. v. Talhouni*, 413 Mass. 781, 785, 604 N.E.2d 689, 691 (1992). Consequently, Claimants' alleged property damage was "expected or intended from the standpoint of the insured," and is excluded from coverage.

124.    Pursuant to the plain and unambiguous language of the CPP Policy, the Underlying Lawsuit does not trigger the CPP Policy's CGL Coverage B – Personal and Advertising Injury Liability.

125.    Pursuant to the plain and unambiguous language of the CPP Policy, the Underlying Lawsuit does not trigger the CPP Policy's CGL Coverage C – Medical Payments.

126.    For the foregoing reasons, pursuant to the plain and unambiguous language of the CPP Policy, Federated is entitled to a declaratory judgment that it has no duty under the CPP Policy to indemnify Defendants Peterson's Oil Service, Inc., Howard Wood Peterson, Jr., and Kristen Peterson Halus with respect to the Underlying Lawsuit.

127.    The applicability of the foregoing coverage defenses is apparent on the face of the Second Amended Complaint filed in the Underlying Lawsuit, and no part of the Underlying Lawsuit is arguably within the scope of coverage.

128.     Therefore, Federated is entitled to a declaration that it has no duty under the CPP Policy to defend Defendants Peterson's Oil Service, Inc., Howard Wood Peterson, Jr., and Kristen Peterson Halus against the claims asserted in the Underlying Lawsuit.

## COUNT II

## DECLARATORY JUDGMENT THAT FEDERATED OWES NEITHER DEFENSE NOR INDEMNITY UNDER THE BAP POLICY

129.     Federated incorporates and restates the allegations of Paragraphs 1 through 128 above as if fully set forth herein.

130.     Pursuant to the plain and unambiguous language of the BAP Policy, coverage thereunder is limited to claims for "'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'"

131.     Claimants do not allege property damage caused by an "accident" resulting from the ownership, maintenance or use of any "auto" covered by the BAP Policy.

132.     Therefore, pursuant to the plain and unambiguous language of the BAP Policy, Federated is entitled to a declaratory judgment that it has no duty under the BAP Policy to indemnify Defendants Peterson's Oil Service, Inc., Howard Wood Peterson, Jr., and Kristen Peterson Halus with respect to the Underlying Lawsuit.

133.     Further, the BAP Policy contains several exclusions which would limit or preclude coverage, were the BAP Policy triggered, including an "Expected or Intended Injury" exclusion, a "Completed Operations" exclusion, and a "Wrong Delivery of Liquid Products" exclusion.

134.     The applicability of the foregoing coverage defenses is apparent on the face of the Second Amended Complaint filed in the Underlying Lawsuit, and no part of the Underlying Lawsuit is arguably within the scope of coverage.

135.     Therefore, Federated is entitled to a declaration that it has no duty under the BAP Policy to defend Defendants Peterson's Oil Service, Inc., Howard Wood Peterson, Jr., and Kristen Peterson Halus against the claims asserted in the Underlying Lawsuit.

## COUNT III

### DECLARATORY JUDGMENT THAT
### FEDERATED OWES NEITHER DEFENSE NOR
### INDEMNITY UNDER THE RHODE ISLAND POLICY

136.     Federated incorporates and restates the allegations of Paragraphs 1 through 135 above as if fully set forth herein.

137.     Pursuant to the plain and unambiguous language of the Rhode Island Policy, coverage thereunder is limited to claims for "'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto,'" which covered "autos" are identified as five vehicles garaged at an address in Rhode Island.

138.     Claimants do not allege property damage caused by an "accident" resulting from the ownership, maintenance or use of any "auto" covered by the Rhode Island Policy.

139.     Therefore, pursuant to the plain and unambiguous language of the Rhode Island Policy, Federated is entitled to a declaratory judgment that it has no duty under the Rhode Island Policy to indemnify Defendants Peterson's Oil Service, Inc., Howard Wood Peterson, Jr., and Kristen Peterson Halus with respect to the Underlying Lawsuit.

140.     Further, the Rhode Island Policy contains several exclusions which would limit or preclude coverage, were the Rhode Island Policy triggered, including an "Expected or Intended Injury" exclusion, a "Completed Operations" exclusion, and a "Wrong Delivery of Liquid Products" exclusion.

141.    The applicability of the foregoing coverage defenses is apparent on the face of the Second Amended Complaint filed in the Underlying Lawsuit, and no part of the Underlying Lawsuit is arguably within the scope of coverage.

142.    Therefore, Federated is entitled to a declaration that it has no duty under the Rhode Island Policy to defend Defendants Peterson's Oil Service, Inc., Howard Wood Peterson, Jr., and Kristen Peterson Halus against the claims asserted in the Underlying Lawsuit.

### COUNT IV

### DECLARATORY JUDGMENT THAT FEDERATED OWES NEITHER DEFENSE NOR INDEMNITY UNDER THE UMBRELLA POLICY

143.    Federated incorporates and restates the allegations of Paragraphs 1 through 142 above as if fully set forth herein.

144.    Pursuant to the plain and unambiguous language of the Umbrella Policy, coverage thereunder is limited to claims for "property damage" which "occurs during the policy period" and which "is covered by 'underlying insurance,'" namely, the CPP Policy.

145.    The Underlying Lawsuit alleges property damage which occurred prior to the policy period, and is therefore not covered under the Umbrella Policy.

146.    Moreover, the Underlying Lawsuit is not covered by the CPP Policy, and is therefore not covered under the Umbrella Policy.

147.    Further, the Umbrella Policy is subject to all exclusions applicable under the CPP Policy; coverage for the Underlying Lawsuit is therefore barred by the CPP Policy's Multi-Cover Liability Endorsement (form CG-F-6 (04-19)), which excludes any property damage "expected or intended from the standpoint of the insured."

148.    For the foregoing reasons, pursuant to the plain and unambiguous language of the Umbrella Policy, Federated is entitled to a declaratory judgment that it has no duty under the

Umbrella Policy to indemnify Defendants Peterson's Oil Service, Inc., Howard Wood Peterson, Jr., and Kristen Peterson Halus with respect to the Underlying Lawsuit.

149.    The applicability of the foregoing coverage defenses is apparent on the face of the Second Amended Complaint filed in the Underlying Lawsuit, and no part of the Underlying Lawsuit is arguably within the scope of coverage.

150.    Therefore, Federated is entitled to a declaration that it has no duty under the Umbrella Policy to defend Defendants Peterson's Oil Service, Inc., Howard Wood Peterson, Jr., and Kristen Peterson Halus against the claims asserted in the Underlying Lawsuit.

## COUNT V

### DECLARATORY JUDGMENT
### THAT THE MAXIMUM TOTAL COVERAGE AVAILABLE
### UNDER THE CPP POLICIES AND UMBRELLA POLICIES IS $11 MILLION

151.    Federated incorporates and restates the allegations of Paragraphs 1 through 150 above as if fully set forth herein.

152.    Pursuant to the plain and unambiguous language of the CPP Policy's Limits of Insurance provision and Two or More Coverage Forms or Policies Issued by Us endorsement (form CG-F-111 (03-12)), Federated's maximum aggregate limit of liability under the CPP Policies with respect to claims arising out of the same "occurrence" is $1 million, even if such claims trigger multiple CPP Policies issued in consecutive years.

153.    Pursuant to the plain and unambiguous language of the Umbrella Policy's Limits of Insurance provision and Two Or More Umbrella Policies Issued By Us condition, Federated's maximum aggregate limit of liability under the Umbrella Policies with respect to claims arising out of the same "occurrence" is $10 million, even if such claims trigger multiple Umbrella Policies issued in consecutive years.

154.     Claimants' and class members' alleged property damage shares the same cause: Peterson's Oil's alleged blending of biodiesel into heating oil it sold to its customers. Therefore, all claims alleged in the Underlying Lawsuit arise out of the same "occurrence."

155.     Accordingly, Federated is entitled to a declaratory judgment that the maximum amount of coverage available under all the CPP Policies issued to Defendant Peterson's Oil Service, Inc., in the event the Court finds that such coverage applies to the Underlying Lawsuit, is $1 million.

156.     Federated is further entitled to a declaratory judgment that the maximum amount of coverage available under all the Umbrella Policies issued to Defendant Peterson's Oil Service, Inc., in the event the Court finds that such coverage applies to the Underlying Lawsuit, is $10 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Federated Mutual Insurance Company, respectfully requests that this Court enter judgment in its favor as follows:

A.     Declaring that the insurance policies issued by Plaintiff do not provide coverage for any of the claims that have been or may be asserted against Defendants Peterson's Oil Service, Inc., Howard Wood Peterson, Jr., and Kristen Peterson Halus by Claimants, either individually or on behalf of others similarly situated.

B.     Declaring that Plaintiff has no obligation to indemnify Defendants Peterson's Oil Service, Inc., Howard Wood Peterson, Jr., and Kristen Peterson Halus with respect to the claims asserted by Claimants, either individually or on behalf of others similarly situated.

C.     Declaring that Plaintiff has no obligation (and never had any obligation) to defend Defendants Peterson's Oil Service, Inc., Howard Wood Peterson, Jr., and Kristen Peterson Halus

against the claims asserted by Claimants, either individually or on behalf of others similarly situated.

D.      Alternatively, declaring that the maximum amount of coverage available under all insurance policies issued by Plaintiff to Defendant Peterson's Oil Service, Inc. with respect to all claims asserted by Claimants, either individually or on behalf of others similarly situated, is $11,000,000.

E.      Granting Plaintiff all other relief which this Court deems just and proper, including costs of this suit.

## JURY DEMAND

Plaintiff hereby demands a jury trial as to all issues so triable.

Respectfully submitted,

Plaintiff,
**FEDERATED MUTUAL INSURANCE COMPANY**

By its attorneys,

Dated:  April 7, 2022

/s/ Eric B. Hermanson
Eric B. Hermanson (BBO #560256)
Austin D. Moody (BBO #704315)
WHITE AND WILLIAMS LLP
101 Arch Street, Suite 1930
Boston, MA  02110
Tel: (617) 748-5200
Fax: (617) 748-5201
hermansone@whiteandwilliams.com
moodya@whiteandwilliams.com

Charles E. Spevacek (pro hac vice pending)
Meagher & Geer, P.L.L.P.
33 South Sixth Street, Suite 4400
Minneapolis, MN 55402
Tel: (612) 347-9171
Fax: (612) 877-3066
cspevacek@meagher.com