## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| FEDERATED MUTUAL INSURANCE COMPANY, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>PETERSON'S OIL SERVICE, INC.,<br>HOWARD WOOD PETERSON, J.R.,<br>KRISTEN PETERSON HALUS, and<br>SHEENA MARANDINO, SEAN<br>MARANDINO, NANCY CARRIGAN,<br>CLAIRE FREDA, KELLEY FREDA,<br>ALICE HART, ROBERT F. HART,<br>TORRE MASTROIANNI, and<br>CONGREGATION OF BETH ISRAEL<br>OF WORCESTER, individually and on behalf<br>of those similarly situated, )<br>)<br>Defendants. ) | Civil Action No. 22-cv-10517-DJC |

## MEMORANDUM AND ORDER

CASPER, J.                                                                                September 21, 2023

### I.    Introduction

Plaintiff Federated Mutual Insurance Company ("Federated") filed this lawsuit against Defendants Peterson's Oil Service, Inc. ("Peterson's Oil"), Howard Wood Peterson, Jr. and Kristen Peterson Halus (collectively, the "Peterson Defendants") and Sheena Marandino, Sean Marandino, Nancy Carrigan, Claire Freda, Kelley Freda, Alice Hart, Robert F. Hart, Torre Mastroianni, and Congregation of Beth Israel of Worcester as representatives of a similarly situated class (collectively, "Claimants") seeking a declaratory judgment that Federated is not liable under any insurance policy issued to the Peterson Defendants for Claimants' claims against them in an

1

underlying state court class action.  D. 1.  Federated has moved for summary judgment on its claims and counterclaims.  D. 51.  For the reasons stated below, the Court DENIES the motion as to a declaratory judgment that there is no coverage under the CGL Policy (and the Umbrella Policy) (Counts I and IV) and ALLOWS it as to the alternative bases of coverage (Counts II and III)[1] and the Mass. Gen. L. c. 93A and c. 176D counterclaim (Counterclaim II) asserted by Claimants.

## II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law."  Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (citation omitted).  The movant bears the burden of demonstrating the absence of a genuine issue of material fact.  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 322–23 (1986).  If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial.  See Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

---

[1] Federated's motion papers did not address Count V, D. 1 at 27-28, so the Court has not reached it here.

III.    **Factual Background**

The Court draws the following facts from the parties' statements of undisputed facts and accompanying exhibits. D. 53; D. 54; D. 58; D. 59; and D. 61.

A.    <u>**The Underlying Litigation**</u>

Claimants allege that the Peterson Defendants sold Claimants fuel for home heating that contained more than 5% biodiesel from 2012 to present.[2]  D. 53 ¶¶ 10–11; D. 59-3 ¶¶ 132–133. Claimants further allege that fuel containing more than 5% biodiesel does not meet industry standards and caused damage to Claimants' home heating equipment.  D. 53 ¶¶ 10, 12; D. 59-3 ¶¶ 34–35, 65–66, 72, 82, 90, 103–04, 114, 128–29.  The Peterson Defendants allegedly did not disclose the presence of biodiesel in their fuel, despite knowing the risk posed by high-biodiesel blended fuel.  D. 53 ¶¶ 11, 14 (citing D. 54-1 ¶¶ 142, 160–162, 216); D. 59-3 ¶¶ 142, 160–162, 216–218 (alleging that Peterson Defendants were aware of high biodiesel content and its risks to customers).

In February 2019, a local news channel aired an investigative report ("I-Team Report") regarding the Peterson Defendants' sale of fuel with high biodiesel content.  D. 53 ¶ 14; D. 59-3 ¶ 142.  During the program, reporters allegedly "presented Howard Peterson with evidence the Marandinos [who are among Claimants here] had received fuel containing more than 80% biodiesel."  D. 59-3 ¶ 142.  Claimants further allege that in an interview, a former employee of

---

[2] In response to Federated's statement of material facts regarding the allegations in the underlying litigation, Claimants dispute unspecified "aspects of Federated's characterizations of the Fourth Amended Complaint as written" and dispute the completeness of those characterizations.  <u>See,</u> <u>e.g.,</u> D. 58 ¶ 10.  Claimants "also note that the operative complaint in the Underlying Litigation is now the Fifth Amended Complaint."  <u>Id.</u>  The Court has reviewed both the fourth amended complaint, D. 54-1, and fifth amended complaint, D. 59-3.  The relevant factual allegations in the fifth amended complaint are largely identical to those of the fourth.  Because it is now the operative complaint, the Court cites primarily to the fifth amended complaint, D. 59-3.

Peterson's Oil "said he spent countless hours repairing heating equipment that had malfunctioned from Peterson Oil's fuel" and admitted that he had lied to customers.  D. 59-3 ¶¶ 161–62.

On March 11, 2019, the Marandinos filed a class action complaint in Suffolk County Superior Court.  See D. 59-6 at 2.  A week later, on March 18, 2019, Claimants' counsel served a demand letter pursuant to Mass. Gen. L. c. 93A ("Demand Letter") on behalf of the Marandinos and the putative class.  D. 59-3 ¶ 199; D. 59-6.  In relevant part, the Demand Letter asserted that the Marandinos and the putative class experienced heating system "shut down[s]" and sought compensation for "the cost of service calls by furnace repair technicians to remedy clogged filters and other problems caused by the high biodiesel content of Peterson's fuel."  D. 59-6.

Claimants have amended the complaint in the underlying litigation several times.  See D. 54-1; D. 59-3; D. 59-8.  The Worcester[3] Superior Court has since certified Claimants' class as consisting of "customers who received fuel from [Peterson's Oil] containing more than five percent biodiesel" at any point between 2012 until the present, see D. 54-4 at 4-5; D. 59-1 at 4-5, with two subclasses for those who received fuel between 2012 and February 28, 2019 and for those who received fuel from March 1, 2019 to the present.  Id.

B.    **The Policy**

Federated issued the Peterson Defendants several insurance policies that became effective on July 5, 2019 and which have all been renewed through the present.  D. 53 ¶¶ 1–2.  These policies include a Commercial Package Policy ("CPP Policy") containing, *inter alia*, Commercial General Liability ("CGL Policy"); a Business Auto Policy ("BAP Policy"); a Commercial Package Policy affording coverage for certain automobiles garaged in Rhode Island ("Rhode Island Policy") and

---

[3] At some point, the underlying litigation was transferred from Suffolk to Worcester Superior Court.  See D. 59-8 at 71.

a Commercial Umbrella Liability Policy (the "Umbrella Policy").  D. 53 ¶ 1; D. 1-3 at 138; D. 2;

D. 54-2; D. 54-3.

## IV.    Procedural History

Federated instituted this action on April 7, 2022.  D. 1.  At the December 5, 2022 scheduling

conference, the Court stayed discovery pending resolution of Federated's present motion for

summary judgment.  D. 49.  On April 14, 2023, the Court heard the parties on the pending motion,

D. 51, and took the matter under advisement.  D. 67.

## V.    Discussion

It is well-settled Massachusetts law that an insurer's duty to defend is broader than its duty

to indemnify.  See Essex Ins. Co. v. BloomSouth Flooring Corp., 562 F.3d 399, 403 (1st Cir. 2009).

To determine whether the insurer has a duty to defend, the Court must compare the facts alleged

in the underlying third-party complaint against the provisions of the insurance policy.  Open

Software Found., Inc. v. U.S. Fid. & Guar. Co., 307 F.3d 11, 15 (1st Cir. 2002) (citation omitted).

"[I]f the allegations of the [underlying] complaint are reasonably susceptible of an interpretation

that they state a claim covered by the terms of the insurance policy," then the insurer has a duty to

defend. HDH Corp. v. Atl. Charter Ins. Co., 425 Mass. 433, 436 (1997) (citing Liberty Mut. Ins.

Co. v. SCA Servs., Inc., 412 Mass. 330, 331–32 (1992)).  The "allegations in the underlying

complaint need only show 'a possibility that the liability claim falls within the insurance coverage'

rather than that the allegations 'specifically and unequivocally make out a claim within the

coverage.'"  Friel Luxury Home Constr., Inc. v. ProBuilders Specialty Ins. Co. RRG, No. 09-cv-

11036-DPW, 2009 WL 5227893, at *2 (D. Mass. Dec. 22, 2009) (quoting Herbert A. Sullivan,

Inc. v. Utica Mut. Ins. Co., 439 Mass. 387, 394 (2003)).  "[W]here an insurer is obligated to defend

an insured on one of the counts alleged against it, the insurer must defend the insured on all counts,

including those that are not covered." <u>Mount Vernon Fire Ins. Co. v. Visionaid, Inc.</u>, 477 Mass. 343, 351 (2017).

By comparison, the duty to indemnify "arises only after the insured's liability has been established." <u>Wilkinson v. Citation Ins. Co.</u>, 447 Mass. 663, 671 (2006).  Unlike the duty to defend, the duty to indemnify is determined by the facts as they unfold at trial or in a settlement agreement, rather than simply the pleadings.  <u>See</u> <u>Travelers Ins. Co. v. Waltham Indus. Labs. Corp.</u>, 883 F.2d 1092, 1099 (1st Cir. 1989).

Initially, the insured party bears the burden of showing that the allegations in the underlying third-party complaint fit within the covered risks in the policy.  <u>Essex</u>, 562 F.3d at 404.  Once satisfied, the burden shifts to the insurer to demonstrate that one or more of the exclusionary provisions applies and there is no duty to defend.  <u>Id.</u>  Courts must abide by the "straightforward meaning of policy language" when possible, <u>Lexington Ins. Co. v. Gen. Acc. Ins. Co. of Am.</u>, 338 F.3d 42, 47 (1st Cir. 2003), but "[t]o the extent (if at all) that any ambiguity permeates a policy exclusion, it must be construed strictly against the insurer."  <u>B & T Masonry Constr. Co. v. Pub. Serv. Mut. Ins. Co.</u>, 382 F.3d 36, 39 (1st Cir. 2004).

## A.   <u>Known-Loss Provision Under the CGL Policy (Count I)</u>

The CGL Policy provides coverage for "bodily injury" and "property damage" that (1) "is covered by an 'occurrence' that takes place in the 'coverage territory';" (2) "occurs during the policy period;" and (3) "[p]rior to the policy period, no insured . . . knew that the 'bodily injury' or 'property damage' had occurred, in whole or in part."  D. 1-3 at 138.  As is relevant here, "property damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property" or "[l]oss of use of tangible property that is not physically injured."  D. 1-3 at 152.  "All such loss of use shall be deemed to occur at the time of the physical injury that caused it" or "at the time of the 'occurrence' that caused it."  <u>Id.</u>

6

The coverage dispute here centers around whether, prior to the policy period, the Peterson Defendants "knew that the . . . 'property damage' [alleged by Claimants] had occurred, in whole or in part." D. 1-3 at 138.  Federated claims that they did and, therefore, Claimants' claims against the Peterson Defendants are not covered under the CGL Policy.  The Peterson Defendants and the Claimants dispute this position and contend that Federated has a duty to defend the former in the Claimants' underlying lawsuit.  As to this known loss provision, the CGL Policy provides in relevant part that if the insured:

> knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

Id.  The insured is also deemed to know that bodily injury or property damage has occurred at the earliest time the insured "[r]eceives a written or verbal demand or claim for damages because of the 'bodily injury' or 'property damage'" or "[b]ecomes aware by any other means that 'bodily injury' or 'property damage' has occurred or has begun to occur."  Id.

### 1.   Duty to Defend

For the purposes of its present motion, Federated does not dispute that Claimants' property damage was caused by an occurrence in the coverage territory as defined in Section 1.b.(1) of the CGL Policy.  See D. 52 at 2 & n.2.  Federated argues that under the CGL Policy, the Peterson Defendants were deemed to know that Claimants' property damage had occurred prior to the policy period.  D. 52 at 2.

Because the CGL Policy makes the Peterson Defendants' no-knowledge of loss a requirement for obtaining coverage, rather than excluding coverage, the Peterson Defendants' (and Claimants' who also are asserting the Peterson Defendants' rights under the Policy) bear the burden of establishing their lack of knowledge.  Arch Specialty Ins. Co. v. Colony Ins. Co., 590 F.

Supp. 3d 395, 420 (D. Mass. 2022) (addressing "no knowledge" requirement for coverage); see Essex, 562 F.3d at 404.  Federated asserts that the Peterson Defendants cannot satisfy this burden because they were deemed to know Claimants' property damage when they received the Demand Letter on March 18, 2019.  D. 52 at 9–10.  Federated further argues that the Peterson Defendants otherwise became aware of the damage due to the I-Team report, the filing of the underlying litigation and customer complaints.  D. 52 at 12.

The Peterson Defendants argue that because Claimants' damages were not "actually adjudicated" prior to the inception of the CGL Policy, Federated cannot deny coverage on the basis of the known-loss doctrine.  D. 66 at 8.  Although the provision in the CGL Policy codify the common-law known-loss doctrine, such policy language restricts coverage in a "more limiting" manner than the common law and "destroy[s] coverage" based upon "just 'aware[ness]' of damage."  Arch, 590 F. Supp. 3d at 422 (alteration in original).  Here the CGL Policy makes clear that the policyholder will be deemed to have knowledge before claims are actually adjudicated, namely when the insured receives a written demand "because of" that damage or "[b]ecomes aware by any other means" that the damage "has occurred or has begun to occur."  D. 1-3 at 138.  By the plain terms of the CGL Policy, if the Peterson Defendants were aware of property damage that began prior to July 5, 2019 (the effective date of the Policy), there is no coverage for any continuation of that damage during the policy period, even if the claims were not actually adjudicated.

Nevertheless, the Court concludes that the no-knowledge requirement does not preclude coverage of all Claimants' property damage.  Relying on the phrase "in whole or in part," Federated asks this Court to treat all Claimants' harm as a monolith, such that the Peterson Defendants' awareness of a specific Claimant's property damage is sufficient to establish

8

knowledge of all Claimants' property damage.  D. 66 at 4 (arguing that "[s]o long as Peterson's

was aware of *part* of Claimants' alleged damages prior to the policy period – which the demand

letter and pending class action complaint indisputably establish – there is no coverage for *any* of

the underlying lawsuit").  Typically, courts do not read "in whole or in part" to deem the insured

aware of damage to all parties based on knowledge of damage to a single party.  See Westfield

Ins. Co. v. Sheehan Const. Co., 580 F. Supp. 2d 701, 705, 716 n.9 (S.D. Ind. 2008) (concluding

that policy did not cover damage of plaintiffs' on whose behalf counsel had contacted insured prior

to issuance of policy, but noting that such exclusion did not apply to other class members' damage),

aff'd, 564 F.3d 817 (7th Cir. 2009); Essex Ins. Co. v. H & H Land Dev. Corp., 525 F. Supp. 2d

1344, 1347 (M.D. Ga. 2007) (concluding that complaints from neighboring landowner did not

establish insured's awareness of damage to other properties under similar language in policy's

known-loss exclusion); see Desert Mountain Props. Ltd. P'ship v. Liberty Mut. Fire Ins. Co., 236

P.3d 421, 434–35 (Ariz. Ct. App. 2010), (rejecting argument that property developer knew of

widespread construction issue "in whole or in part" based on initial customer complaints which

were resolved), aff'd, 250 P.3d 196 (Ariz. 2011).

The Peterson Defendants were aware, prior to the CGL Policy's inception that a potential

class, not merely individuals named in the Demand Letter or early complaints, had begun to suffer

property damage due to Peterson Oil's unsuitable fuel.  See, e.g., D. 59-8 at 123–53.  By July 5,

2019, the Peterson Defendants had reason to be "aware" of property damage suffered by Claimants

who received fuel prior to July 5, 2019, including a Demand Letter on behalf of a putative class,

class action complaint and local media coverage.  D. 59-3 ¶¶ 164–65, 199; D. 59-6; D. 59-8 at

123–53.  Compare Trinity Universal Ins. Co. v. Turner Funeral Home, Inc., No. 1:02-CV-083,

2003 WL 23218046, at *16 (E.D. Tenn. Dec. 12, 2003) (holding that insurer had no duty to

9

indemnify under common-law loss-in-progress doctrine where prior to the policy start date harm suffered by insured's customers was reported in national media and insured had received class action complaints) with Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp., 73 F.3d 1178, 1215 (2d Cir. 1995) (concluding that common-law known-loss doctrine did not bar coverage for asbestos claims even though insured knew of risk of asbestosis and cancers and had received large number of claims because "prospective number of injuries, the number of claims, the likelihood of successful claims, and the amount of ultimate losses it would be called upon to pay" remained uncertain).   Under the plain language of the Policy, the Peterson Defendants "receive[d] a written . . . demand or claim for damages because of the . . . 'property damage'" suffered by a class of Claimants who received fuel prior to July 5, 2019.  D. 1-3 at 138.

Even so, Federated is not absolved of its duty to defend the Peterson Defendants against Claimants whose damage did not begin until after the CGL Policy took effect.  The Claimant class includes customers who received fuel on or after July 5, 2019.  D. 59-1 at 6 (certifying class to include customers who received fuel at any point between 2012 and the present). Although it attempts to treat the Claimants' collective property damage as a single occurrence, Federated has not cited any cases holding that similar known-loss provisions allow the Court to deem the policyholder aware of damage to class members which began after the insurance policy's inception, based on knowledge of damage to other class members prior to inception.  In Clarendon Nat'l Ins. Co. v. Philadelphia Indem. Ins. Co., 954 F.3d 397, 406 (1st Cir. 2020) and in Arch, leaks that continued into the policy period affected the same condominium units and resulted from the same preexisting cause as the leaks predating the policy's inception.  Clarendon, 954 F.3d at 406 (affirming district court's ruling that leaks within policy period continued from unresolved leaks predating policy period); Arch, 590 F. Supp. 3d at 405–06, 423 (characterizing leaks to upper roof

of the unit as a continuation of leaks to lower roof of same unit where insured had actual knowledge that the drain serving both roofs was defective upon installation).   These cases did not hold that knowledge of the pre-policy period leaks could preclude coverage for subsequent leaks affecting other units that stemmed from similar, but separate defects.  In SCA Services, the Supreme Judicial Court ruled that the common-law known-loss doctrine precluded coverage for class action damages created by the insured's operation of a hazardous waste landfill.  SCA Servs., Inc. v. Transp. Ins. Co., 419 Mass. 528, 534 (1995).  By the time the policy began, the landfill in question had been declared a nuisance and closed and "SCA knew that the residents [of the town] were damaged by the operation of the site."  Id.  Thus there was no allegation in the class action in SCA Services that the insured caused property damage to class members who had not been exposed to the hazardous landfill prior to the policy's effective date.

Here, some Claimants allegedly received unsuitable fuel from after the CGL Policy's effective date.  See, e.g., D. 59-3 ¶ 75 (alleging that Freda received fuel on February 6, 2020); id. ¶ 99 (alleging that Mastroianni received fuel in March 2021).  The Peterson Defendants did not become "aware by any other means that . . . 'property damage' has occurred or has begun to occur" for Claimants who did not receive oil deliveries until after the issuance of the Policy.  D. 1 at 138. Those Claimants' property damage had neither "occurred" nor "begun to occur."   Nor was the Demand Letter received "because of" property damage that had not even begun.  See id.  That is, property damage suffered by Claimants like Freda or Mastroianni was not a "continuation, change or resumption" in damage suffered by Claimants Marandinos and Carrigan.  Freda's property damage stemmed from the fuel she received in February 2020, not from the fuel received by the Marandinos and to Carrigan 2018-19.  D. 59-3 ¶¶ 29, 48, 74.  As alleged, Freda, Mastroianni and the other Claimants engaged in individual transactions with the Peterson Defendants and suffered

11

damage from a distinct source which they would otherwise have avoided.  See Alkemade v. Quanta
Indem. Co., 687 F. App'x 649, 652 (9th Cir. 2017) (concluding that later damage was "distinct
from—rather than a continuation, change or resumption of—the former damage" where later
damage would not have occurred absent new negligence in the attempted repair).

At oral argument, Federated urged this Court to treat Claimants' damage as stemming from
a "common defect" in the Peterson Defendants' product, of which the Peterson Defendants were
aware prior to the policy start date.  The Court acknowledges that Demand Letter and early
complaints put the Peterson Defendants on notice of a class action regarding their sale of high-
biodiesel fuel, D. 59-6; D. 59-8 at 123–53, but knowledge of the existence of a class did not
establish knowledge of later Claimants' property damage.  As class members, Claimants seek
individual damages, even though they share class-wide theories of liability.  D. 59-1 at 9–10
(concluding that common questions of fact or law predominate over "any individualized questions,
such as proof of damages" and certifying Claimants' class).  The plain language of the CGL Policy,
however, focuses on whether the Peterson Defendants had knowledge of the "property damage"
and whether such property damage continued, changed or resumed, rather than the whether the
Peterson Defendants were on notice of the Claimants' shared theory of liability.  D. 1-3 at 138
(precluding coverage if insured "knew, prior to the policy period, that the 'bodily injury' or
'property damage' occurred" (emphasis added)); id. (deeming insured aware of "property
damage" where insured "[r]eceives a written or verbal demand or claim for damages because of
the 'bodily injury' or 'property damage'" or "[b]ecomes aware by any other means that 'bodily
injury' or 'property damage' has occurred or has begun to occur" (emphasis added)); see Great
N. Nekoosa Corp. v. Aetna Cas. & Sur. Co., 921 F. Supp. 401, 416 (N.D. Miss. 1996) (explaining
that comprehensive general liability insurance is defines coverage "in terms of certain injuries

sustained (bodily injury and property damage) and not in terms of the theory of liability"); see Friel Luxury Home Const., Inc., 2009 WL 5227893, at *3, 6 (explaining that whether "property damage" was caused by "occurrence" depends upon "the source from which the alleged harm in the underlying [claim] originates rather than the specific theories of liability alleged" (citation omitted)).

In short, Federated argues that the Peterson Defendants' knowledge of property damage resulting from fuel deliveries to the Marandinos, Carrigan and a class of similarly situated Claimants sufficiently establishes knowledge of property damage to Claimants who received fuel after the policy start date.  It does not appear that any case interprets the known loss provision (and the associated deeming clauses) so broadly.  Because Federated has a duty to defend at least claims brought by Claimants who received high-biodiesel fuel from the Peterson Defendants after July 5, 2019, Federated has a duty to defend the entire underlying lawsuit.  See Mount Vernon, 477 Mass. at 351–52 (collecting cases) (citing "in for one, in for all" rule).

### 2. *Duty to Indemnify*

Federated also seeks summary judgment that it has no duty to indemnify the Peterson Defendants in the underlying lawsuit based on its asserted lack of any duty to defend.  D. 52 at 7, 13.  The Court has already concluded that Federated has a duty to defend.  Because the underlying lawsuit has not reached its conclusion or otherwise been resolved, summary judgment on its duty to indemnity is denied as premature.

Accordingly, the Court denies Federated's motion for summary judgment for a declaratory judgment that it has no duty to defend or indemnify under the CGL Policy, Count I.

### B.   **BAP Policy and Rhode Island Policy (Counts II and III)**

Federated contends that the BAP Policy and Rhode Island Policy only cover property damage caused by "an 'accident' and resulting from the ownership, maintenance or use of a

covered 'auto.'" D. 52 at 14; D. 66 at 9–10; see D. 54-3 at 15.  Such policy language does not

capture "all circumstances in which the injury would not have occurred 'but for' the involvement

of a motor vehicle." Rischitelli v. Safety Ins. Co., 423 Mass. 703, 704 (1996).  "An injury arises

out of the use of a vehicle within the provisions of an automobile insurance policy when a causal

connection is reasonably apparent between the use to which the vehicle is being put and the

resulting injury." Com. Ins. Co. v. Ultimate Livery Serv., Inc., 452 Mass. 639, 653–54 (2008)

(internal citation and quotation marks omitted).

  Here, Claimants urge that because their damage "resulted from deliveries made using

Peterson Oil's trucks," their losses were "caused by an 'accident' resulting from the ***use of a***

***covered auto***."  D. 57 at 19 (emphasis in original); see Metro. Prop. & Cas. Ins. Co. v. Santos, 55

Mass. App. Ct. 789, 796 (2002) (concluding that unloading may constitute covered "use" under

business auto policy).  Claimants, however, allege that their property damage was caused by the

chemical composition of the Peterson Defendants' fuel, not by any part of the delivery process.

D. 59-3 ¶¶ 34, 58, 65–66, 82, 90, 94, 103, 151–154, 157.  The chemical composition of the fuel

itself was thus an independent and intervening cause from the use of covered trucks to deliver said

fuel.  See A & W Maint., Inc. v. First Mercury Ins. Co., 91 F. Supp. 3d 113, 124 (D. Mass. 2015)

(holding that use of truck to carry equipment to worksite did not cause worker acting as spotter to

fall into open tank, because "presence of open tank (and the lack of adequate safeguards) was an

independent, intervening, and unique cause of [worker's] injuries"); Cent. Mut. Ins. Co. v. Bos.

Tel., Inc., 486 F. Supp. 2d 180, 185 (D. Mass. 2007) (concluding that there was "insufficient causal

connection between any use of the bucket truck and the injury" where the failure to place warning

cones around work site was intervening cause where such cones would have prevented collision

with insured's truck); OneBeacon Am. Ins. Co. v. Haffner's Serv. Stations, Inc., 74 Mass. App.

Ct. 1118, 2009 WL 1687720, at *2 (2009) (holding that leaks from customer's heating system that occurred both during and after insured's delivery of oil would be "too attenuated from the 'use' of the delivery vehicles"). Given the allegations in the underlying litigation, the Peterson Defendants and Claimants have not established that coverage is available under the BAP Policy or the Rhode Island Policy for "use" of a covered automobile.

Accordingly, the Court allows Federated's motion for summary judgment with respect to its lack of any duty to defend or indemnify for Claimants' property damage under the BAP Policy or Rhode Island Policy, Counts II and III.

### C.      Umbrella Policy (Count IV)

The parties do not dispute that the Umbrella Policy provides additional insurance limits for property damage that is covered by the CGL Policy or the BAP Policy. See D. 2 (listing limits of liability for "Commercial General Liability" and "Business Auto"); D. 52 at 14; D. 57 at 19–20. Because the Court concludes that there is coverage under the CGL Policy for the reasons stated above, the Court denies Federated's motion for summary judgment regarding the Umbrella Policy, Count IV.

### D.      Counterclaims Under Mass. Gen. L. c. 176D and Mass. Gen. L c. 93A

Federated also moves for summary judgment on Claimants' counterclaims for unfair insurance claim settlement practices under Massachusetts law. D. 52 at 17–18. "A violation of [chapter] 176D amounts to an unfair or deceptive act or practice for purposes of claims made under [chapter] 93A." McGilloway v. Safety Ins. Co., 488 Mass. 610, 618 (2021) (internal citation and quotation marks omitted). "Recovery under [chapter] 93A for a violation of [chapter] 176D, § 3(9), is unlikely when '[a]n insurance company . . . in good faith denies a claim of coverage on the basis of a plausible interpretation of its insurance policy.'" Id. (quoting Gulezian v. Lincoln Ins. Co., 339 Mass. 606, 613 (1987)). Chapter 176D, section 3(9) "regulates the insurance business and

identifies unfair claim settlement practices." Id. (internal citation and quotation marks omitted). Unfair claim settlement practices include "[f]ailing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." Mass. Gen. L. c. 176D, §3(9)(f).

Although the Court denies Federated's motion for summary judgment with respect to coverage under the CGL Policy and Umbrella Policy, the Court nevertheless concludes that Federated adopted a plausible interpretation of the known loss provision. McGilloway, 488 Mass. at 618 (affirming summary judgment in favor of the insurer on the Chapter 93A and Chapter 176D claims where the insurer had relied upon a "plausible, although ultimately incorrect, interpretation of its policy") (internal citation and quotation marks omitted).  Given the case law on similar known loss and loss-in-progress insurance provisions, Federated's liability was not reasonably clear. Am. Universal Ins. Co. v. Med. Malpractice Joint Underwriting Ass'n of Mass., No. CA891749D, 1993 WL 818614, at *22 (Mass. Super. Sept. 3, 1993) (explaining that liability is not "reasonably clear" "if there is room for objectively reasonable debate about whether liability exists").  Accordingly, the Court allows Federated's summary judgment motion on the Claimants' counterclaims.

## VI.   Conclusion

For the foregoing reasons, the Court ALLOWS Federated's motion for summary judgment, D. 51, as to Counts II and III (declaratory judgment that Federated has no duty to defend or indemnify the Peterson Defendants under the BAP Policy or Rhode Island Policy) and as to Count II of Claimants' counterclaims (unfair settlement practices under Mass. Gen. Laws. c. 93A, c. 176D).  The Court otherwise DENIES Federated's motion for summary judgment as to Counts I and IV as the Court concludes that Federated has a duty to defend Peterson in the Underlying suit

under the CGL Policy (and any additional limits under the Umbrella Policy) and its motion as to
its duty to indemnify is not yet ripe.

    **So Ordered.**

/s/ Denise J. Casper
United States District Judge
